If it may please the court, I will reserve five minutes for rebuttal. This case presents a straightforward and clear violation of the United States Supreme Court's holding in Vlandis v. Kline. It's straightforward because the defendants put the constitutional violation down in writing. It's clear because the primary administrative official, Clayton Christensen, testified that he knew the rule before and after its amendment violated the law. This case challenges Rule 940.1 of the Board of Regents of Montana, which applies, oddly, to professional students. The university defines professional students as those in the study of law, not pharmacy or physical therapy. Those students are treated differently than all other students that attend the university. If you are new to Montana, and new to Montana meaning you moved there with the intent to stay, which is all that's required for residency, and you choose to study one of those three subjects, when the suit was brought, Rule 940.1 said that these quote-unquote professional students were not eligible for reclassification and shall maintain their out-of-state residency for the duration of their studies. So Vlandis said the universities couldn't have an irrebuttable presumption. Correct. Correct. Okay, I mean, and if you look at the rule, the first one that we're dealing with, and probably even for the second one as well, but here, despite the clear language in the rule, there was consideration given to other factors. What do we do with that? There was no consideration given to other factors. And I'm going to explain. Hagen... Well, I mean, some of them there was clear consideration of other factors. Commissioner Christian's letter to every single student ended the same. And the best way to see this is in the two letters written to Mr. Bennett. That all the letters ended, you are a professional student, you retain your out-of-state residency for the duration of your studies. That was the only reason given in writing to Mr. Bennett, both times. The reason it was the only reason given to him is, upon moving to Montana in August of 21, he did everything they asked of him. Everything. There was nothing else he could have done. And both times, Commissioner Christian denied him. In written discovery, we asked during the eight-year statute of limitations, I think it was going back to 2015, who had been granted in-state status despite this irrebuttable presumption. And the written discovery response was nobody. So I'm looking at the denial letter. I mean, it ends in saying, importantly, even if I were to waive the requirements of the policy and allow you to seek reclassifications, you do not meet the policy requirements for residency. The 12-month continuous period of domicile in Montana with a documented and dated intent to become has not yet elapsed. So isn't that another reason, not because of the policy? And this is to Bennett? Yes, I believe. Yep, no, sorry, Bethany Niemann. Sure, and I think Bethany Niemann's a good example because the court really weighed the evidence. I mean, that's the fundamental error here that we are appealing. The court abused its discretion because it weighed the evidence. Bethany Niemann is a resident of Montana today. She moved to Montana after selling her home, brought her husband, he immediately got a job, and they live there today. She did everything that was required of her, including obtaining her husband obtained employment. Of course, it's important to note law students and pharmacy students can't obtain employment. It's one of the requirements of the program. She obtained her driver's license. She registered her vehicle. She registered to vote. All the students paid taxes for all the years they were in Montana. So may I ask, did you dispute that Commissioner Christian could weigh the requirements of the policy? We disputed that he could because he never did. Well, that's not a dispute. I mean, there's a difference between having authority to do it and then exercising that authority. Do you dispute that he has that authority? We dispute that he has the authority. But what evidence do you have to show that he doesn't have that authority? The fact that it was never done and he testified he applies the rule. As written, he said that he doesn't apply the rule. Well, he said he does a totality of the circumstances. But until the case was filed in the prior eight years, nobody had passed. And Bennett's a good example. He couldn't have come up with any other reason to exclude Bennett. I mean, in the letter itself, he says that he has the ability to weigh the requirements of the BOR policy 941.1. But he couldn't identify ever having done that. Yeah. But that's a distinction, though, don't you see? I mean, like one is a legal authority. One is whether or not he exercises that legal authority. It is our position he and this is another thing he testified to. He expected all of his subordinates, the registrars. Throughout the university system to apply the rule as written, he applied the rule as written, a fair reading of both letters to Mr. Bennett are you're a professional student, you cannot be reclassified. That's all it says, because they couldn't they could not identify another factor even under the new rule. And here's how they tried to fix the problem. When we filed the lawsuit, the new rule said that professional degree program students maintain their student status, maintain their non-residency status while in student status. You basically now have to. And this is the rule enforced today. You have to move to Montana and live there for 12 months without going to school. If during that 12 months you go to school at any point with your family, your kids, you buy a home, you get a job, you pay taxes, you still can never become a resident under this policy as long as you maintain student status. And the district court, on the motion to dismiss, said that the policy still bars professional degree program students from controverting the residency classification while in student status. The policy is unconstitutional on its face and it's applied to them. I mean, the court clearly. The thing is, I agree with you if that was it. But the problem is that they are asserting an appellate right, that the commissioner is asserting a right to waive those requirements. And and he testified that he doesn't apply the law irrebuttably. So that's what takes us out of Landis, in my view. And then you're not in the need. You don't have clearly established law. Sure. But that also falls victim to exactly what the district court did. This is summary judgment. All of the students that, you know, Neiman and Vincenzo still live in Montana. Bennett. But that's not the. Go ahead. No, you go ahead. But that's not the fact that's being disputed. The fact that's being disputed is whether or not the commissioner has the ability to waive the requirements. But that's a dispute of fact. Well, that's my question. Is it a dispute of fact? It's a legal authority and you haven't put forward any evidence or any law saying that the commissioner can't do it. The only thing is you have an inference that he didn't exercise it, which is something, but it's not dispositive in any way. On summary judgment, we would argue it's dispositive. And his testimony that he could make an exception is rebutted by the evidence where you've got students that have done everything the rule requires. That includes Neiman, Bennett, Bolina, Caldwell, Casey, Hagan, Vincenzo and Ward. I mean, they all did what the rule requires. And yet the only thing they were told is you're a professional student and the rule says what it says. Hagan's a good example because there's a lot of people like him. He was a law student. He's now clerking for a federal district court. He read the rule. He understood that not eligible means not eligible. So he didn't apply. He doesn't have to apply to be a victim. He understood that the rule says what it says and there is no discretion for the commissioner to readdress that. This question just a little bit further. Judge Wooten takes the question a little bit further and that's this. Okay, let's assume, so we're in the world of public officials. They have the right to claim qualified immunity. Qualified immunity consists of two parts. On the facts of the ledge, if you take them as true, basically if you take them as true, there's a reasonable likelihood that a jury could find in favor of the plaintiffs, okay? All right, but the officials can claim qualified immunity. And the qualified immunity, the key test there is, was the law clearly established at the time of the action? Okay, so here we just don't, we know with respect to some of these individuals, despite what you say and the way you read the letter, the way I read the letter is with respect to some like Nieman, she was able to present some evidence or whatever, give her position on why she was entitled to be classified as an in-state student. And the rule does apply that there's some right of appeal. And so on all these facts, what, Landis was pretty clear, it dealt with a clear irrebuttable presumption. We have a little bit more here. So what law says, what's case or what, you know, what authority do you have that under these circumstances these officials should have known what they did, violated Ms. Nieman's constitutional rights under these circumstances? Well, we have more than that. We have Commissioner Christian's admission. I mean, that's what takes us beyond the prior cases. This has been a 30-year battle and- Well, I realize you have his admission, but what, you know, was there any law that said that any case that if he had read, he'd know that he, that even considering these facts, would there be some case that would say, you know, you can't, what you're doing here is you're violating this guy's rights. You got to- Landis. And I asked him in his deposition, he knew about Landis. He knew that an irrebuttable presumption violated the law. He understood this. He understood that the rule is written violated the law. And the cosmetic amendment, the district court found that that still violated the law because it still excluded anybody that took higher education in the first 12 months of moving to Montana to be permanently classified as non-resident. I guess your argument is, is that Landis, which prohibits the use of an irrebuttable presumption, clearly applies in this circumstance. Absolutely. This is 100% on point. And to you, it makes no difference that they, that the officials, you know, considered other factors. Because one of them, I figure which letter it is. I mean, there are like six or six, there are like five letters or whatever. Some of them clearly say, you know, you raise the question of whether or not this is lawful. And so therefore, we're going to go on and I'm going to consider all these other things. But they didn't do that for Hagen. They didn't do that for Bennett. They didn't do it for all of the students. And to the extent they pretended to, every letter does end with, you're a professional student and you're barred from repatriation. There were some, there's a question about Bolano? Bolano? Bolino. Bolino. That Bolano never applied for reclassification. But as I read the answer to your, to the complaint, which alleges that she did or he did, I don't know, male or female. That the universe, the defendants answered in the answer, they said, yes, we admit that she applied or he applied. Jora Bolino, the gentleman, yes. Is that correct? Applied for reclassification, yes. Hagen's the only one that didn't because he knew it was futile. And the others that did found out it was futile because their letters told them, you're a professional student, you can't be reclassified. That is how this rule was applied by an administrative official after testifying he knew it was unlawful. The lip service given to, well, we could have made an exception. The evidence on summary judgment shows that they never did. They only did during litigation on a single occasion. You make a big point of that, but I'm not sure that answers all my questions. But let me ask you this. Let's assume that we were to agree with you that they don't get qualified immunity. Okay. Do all the cases go back? All the cases go back. And what happens? The court should reconsider this without choosing which facts to believe and which facts not to believe. That's the fundamental. Wouldn't there have to be a trial? It, no, the court can declare after doing it again, that what it said the first time that this is unconstitutional on its face and applies to the, as applied to these defendants. And then as a practical matter, if that's what the court's asking, the administrative process of the class action would probably involve the appointment of the mediator. We all know most people that are truly non-resident wouldn't. There's no right to a jury trial here? There is a right to a jury trial, but the necessity of that in a claims administration process would be limited. This only asks the university to do what they needed to do the first time. Who decides whether or not any of the defendants suffered real damages? Everybody suffered damages. In other words, would a trial, would the university be able to show that despite this rule, they never would have qualified for in-resident status? Anyway, because they were getting 50% of their income from an outside source. That is the university's burden if they contest some of these students, but a lot of them are going to be living in Montana today. That's, okay, fine. Either I'm not connecting or... Yeah, maybe I'm not understanding the question. That's okay. I don't want to beat the point. I realize you're over time. May I ask a question? Thank you. I'd like to drill down a little bit more on the nature of the alleged violation of Vlandis in this case. And in Vlandis, the court struck down the Connecticut law that established a permanent irrebuttable presumption as to the student's status, whether in-state or out-of-state. And in that case, the Supreme Court held that the law violated due process, because it provides no opportunity for students who applied from out-of-state to demonstrate that they have become bona fide Connecticut residents, end quote. And that's at page 443. So in this case, subsequent to Vlandis, the Montana Attorney General issued an opinion letter opining on whether the Vlandis decision raised concerns about the constitutionality of the Montana scheme. And in that attorney general opinion, it held that Vlandis did not, excuse me, the school's policy did not violate Vlandis because, quote, the fact that a full-time student at any unit of the Montana university system may change his classification from non-resident to resident for fee purposes, removes the Montana statutes from the unconstitutional taint found in the Connecticut law in Vlandis. And the attorney general continues later in that opinion, it is thus apparent that unlike the students who challenged residency laws in Vlandis and Covell, students attending any unit of the Montana university system may, even while full-time students present evidence sufficient to warrant a change in their classification from non-resident student to resident student for tuition and fee purposes. So contrary to what the attorney general said in that 1973 opinion letter, at least as applied to the professional students, that residency policy did not allow them to change their classification under any circumstance. So I realize that's a lengthy lead up, but subsection H provides any out-of-state student admitted to the professional degree program is not eligible for reclassification as an in-state resident and shall remain classified as an out-of-state student for the duration. And then it goes on to say a student classified as out-of-state who maintains the initial classification was an error, may only seek reclassification pursuant to the procedures of this policy prior to the starting the initial term of enrollment. So the focus on my question and my struggle to really understand the issue in this case, frankly, is that, is not whether the residency policy in general look to a variety of other considerations to determine whether the student qualified for in-state costs. The focus of my question is whether subsection H per se violates Vlandis because professional students were expressly prohibited from being able to petition for reclassification based on that change of circumstance, which I think, in my opinion, then provides no opportunity for students to demonstrate they have become bona fide state residents contrary to Vlandis, which is to say they're stuck in time. Could you please just, is that what you're, is that different from what you're arguing or is that a fair reading of what your position is as to the problem with the policy as to the professional students? You're exactly correct. That is our position. The constitutional violation is complete for every professional student and to the extent there's a factual question of whether Commissioner Christian varies from what's written, he testified, he applies it as written because he needs to address the limited number of seats in these professions. It's why these professions were selected. They have a limited number of seats and he wants to control the proportionality of in-state to out-of-state and so I think that the policy is unconstitutional on its face. The district court recognized that and it was applied to people like Hagan and other people like Bennett and all of these plaintiffs and that's the end of the story. The question about to what degree people were residents or for how long they were residents, that's not, that's a temporal issue. This question of constitutionality is addressed at the beginning. Their intent to remain in their domicile in-state and the question of damages, a remedial question that would be dealt with the district court later is a question that comes after the constitutionality of the statute itself is addressed. I'm sorry. No, go ahead. And if that, if the court were to find that the policy provision is a per se violation of Landis, that would then create standing for all of the students if only under the futility doctrine? All students for at least nominal damages and all students having an opportunity to have the policy applied. Though the problem we're dealing with here is one of timing. People did not get a fair shake before because the policy said what it said and applied and students, even if it's just lip service to other factors, ultimately they were all cited the rule that says they can't be students and there's, on summary judgment, you have to assume that that one in those letters carried the day. No, I was just going to confirm. In other words, it's your position, this is what I assume from your answer to Judge Maggio's question. Yeah. The fact that the university considered other factors is irrelevant. Absolutely. It allowed people to present evidence of other factors. But it's meaningless. On a summary judgment, you can look at Bennett and there's nothing he didn't do. So you have to conclude that Commissioner Christian is not varying because that's a clear case where if he was going to vary, there's nothing else to hold against him. He did every one of the things they asked. Driver's license, voting, taxes, registration, everything. Okay. We'll give you some time for rebuttal. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. Dale Schongert for the University System and the other appellees. This case is not about a permanent or irrebuttable presumption of residency or non-residency. As this court recognized in Carlson v. Reed, due process concerns arise only when the state purports to be concerned about residency, but then precludes students from presenting factors that clearly bear on that determination. The Montana University System rule does not do that. The residency policy is applied rebuttably through exceptions, through individualized determinations by the Commissioner, and through a multi-level appeal process that considers objective evidence of domicile and intent. The Commissioner reviewed the plaintiff's circumstances and concluded, based on the facts, that they did not make Montana their permanent home. And that conclusion was borne out by the facts. Every plaintiff but one moved from Montana shortly after graduation. The undisputed facts also defeat the plaintiff's standing. Almost all the plaintiffs failed to timely take even basic steps to show residency, like registering to vote, getting a Montana driver's license, or registering their car. They no longer reside in Montana, face no future application of the rule, and seek only retrospective relief for a subsidy they were never entitled to receive in the first place. This case, therefore, falls well outside Blandes. It involves a permissible domicile-based standard for allocating a limited public benefit applied case by case, not a categorical bar. The District Court's judgment should be affirmed. So, you know, in the first policy that we're dealing with, what's your response? What do we do with the fact that it says, you know, the policy provides that an out-of-state student admitted to a professional degree program is not eligible for reclassification as an in-state resident and shall remain classified as an out-of-state student for the duration of the student's enrollment in the professional program? I think the very next paragraph... I mean, that's clear. Isn't that clear? What more do you need? As the District Court said, the exceptions temper that absolute language. But it says there's an exception. The next paragraph in the policy says, notwithstanding the requirements, it has these exceptions. And I think this is where the Supreme Court's decision in Weinberger v. Salfi is important. Weinberger was decided two years after Blandes. And the courts there said, okay, we're going to clarify Blandes and the other cases that apply to irrebuttable presumption. That was the case that involved surviving spousal benefits from a deceased wage earner. And the rule was that you had to be married nine months before the surviving spouse was entitled to those benefits. There was no individualized exception. But the court said, individual determination, but there were exceptions. So if the deceased spouse had adopted the wage earner's child or they had... Those are pretty narrow exceptions though, like cover all members of the armed forces and things of that nature. So, well, it's not a broad-based exception. I think... Two points, Your Honor. First of all, I think the exception that an employee, someone is... If they're employed in Montana full-time, which is considered 30 hours a week, that applies to the spouse, the student, and the dependents of the wage earner if they didn't move to Montana for the purpose of coming to school. I think that's a pretty broad exception. I'd also point out at... This is the new policy, but it was in both policies. ER 31, there's an affidavit of... Which is kind of a catch-all, an affidavit of intent for extraordinary circumstances. And that allows students to show extraordinary circumstances, why they couldn't meet the requirements of the policy. That applied only in the later policy, right? No, that's applied in both policies. So, it's the ER 31, it's subsection 1C5 in the old policy, and it's subsection C3 in the... I'm sorry, in the old policy. First was the new. No. I stopped too soon because the next sentence after the one that I had read provides, a student classified as out-of-state who maintains the initial classification was an error may only seek reclassification pursuant to the procedures of this policy prior to the start of the initial term of enrollment or matriculation into the program. So, in other words, they had to do it before, they had to satisfy before they started the program. And once they're into that program, they're precluded. Generally, that's true, but there are exceptions. That is what it says, but there's also the affidavit intent for extraordinary circumstances, and there are exceptions in the old one. Yes, Your Honor. Again, where is that? That is at ER 24, excuse me, ER 24, 1C sub 3. ER 24, what's the C what? C3. And that allows, and it's similar language, somewhat different. It gives an example under the new policy ER 31, but that gives students an opportunity to prove extraordinary circumstances. Yeah, but how do you read that with the fact that you're in a professional program? The commissioner applies this to all the requirements, and he testified very clearly about this. He looks at the totality of the circumstances for each student and makes a determination to determine whether they made Montana their permanent home. I guess my problem is that the only evidence that he has the ability to waive these requirements is his testimony. Is that right? Well, no, there's a concrete example, and this is SCR 93 to 94. It's a law student who did not meet the requirements of the policy, and he said, you know what? He had moved away, I think in fifth grade because of a family illness, moved to Arizona for medical care. But counsel, that example in the record is the letter dated August 12, 2024, which was after the rule was amended to remove the language that I've referred to and Judge Piaz referred to as to professional students, and this letter was actually also after this lawsuit was filed in June of 2023, correct? It was, but the commissioner testified that that's how they've always applied the policy, and he gave an example. So another example is that if a student, I think he mentioned that a student was denied reclassification because she hadn't registered to vote. She came back and said, well, I didn't this is SCR 273, and I don't want to register to vote, and that's an exception that is made under the policy, even though it doesn't comply strictly. Is there any evidence in the prior regulation that the Commissioner Christian has this authority? The authority. To waive the requirements of BOR policy 94.1. It's not stated as such, but I think because the exceptions exist, because the affidavit of intent for extraordinary circumstances are the same in the old and the new policy, and then both policies, the final policy, I think it's the final or second to final paragraph of both policies, give the student the opportunity to present all information that they think are important, and in fact, what are we supposed to do that, you know, the appellants just disagree with that authority exists. So is that a factual dispute that we have to then allow to go to summary judgment, or is that a legal question that we can answer? It's a legal question, and the district court was right to conclude that it was undisputed. I mean, it was undisputed that the Commissioner has exercised that authority, and that's how that he viewed the policy, and that's how he's always applied the policy, and so I do think that's undisputed, and especially, I mean, we're looking through the lens of qualified immunity. Obviously, there's no injunctive declaratory relief. We're talking about whether the law was clearly established. Under Weinberger v. Salphy, the court there said you don't even have to make individual determinations. The widow in that case, she couldn't make her case that she was a, it was a legitimate marriage. I mean, obviously, that rule was to prohibit sham marriages, and the court said, you know, we've got these exceptions. They're fairly narrow, but they were exceptions, and there was no requirement for individual determinations. Montana's policy goes beyond what Weinberger v. Salphy required by making these individualized determinations on appeal, and I think the Commissioner said repeatedly throughout his deposition, just SCR 155 and SCR 220, a couple examples that he looks at everything, and he wants to determine. Now, it is a rigorous policy, and that's especially so, you know, keep in mind, too, Volantis only dealt with undergraduate students. Can anyone appeal Commissioner Christensen's decisions? Correct. Anybody can appeal to the Board of Regents. The Board of Regents? Has that ever happened? It has, and some of the plaintiffs in this case did that. And then what did they do? The Board of Regents? They affirmed. They affirmed. Does the Board of Regents have the ability to waive all these requirements as well? They do. I mean, they have absolute authority over the policy, so, and these weren't, as the Court asked my friend, these weren't, most of these weren't difficult questions, and most of them, you know, the Commissioner cited, this is SCR 124 to 148 in the letters, cited multiple reasons because most of these plaintiffs didn't even complete basic steps. So they're challenging these professional degree policy requirements, but they didn't even take basic steps to establish residency for the 12 months, you know, to start that clock, that 12-month clock, and Bethany Neiman is a good example. She applied to, for voter, for her voter registration the day she sought reclassification, and I think Bethany Neiman is a good example of that. Was that after she was already admitted to the university? It was after she had already admitted, she had been... On her this policy, she would have done, she would have been prescient enough to know that she was going to go to the University of Montana School of Law a year earlier and start the whole process at that time. Sure, well, I mean, that's... It's kind of ridiculous. Well, that's an option, I mean, because this is a valuable, portable benefit, and so the plaintiffs even said, look, universities can make virtually certain that people didn't move to the state to go to school. And the evidence that Commissioner Christian said was that most times when a student in a professional degree program moves from out of state and then immediately starts school, most of the time they leave after school is done, because it is a terminal degree, it is a portable benefit, and it's a valuable one. I have a follow-up question, please, Counsel. So if we look at the decision in Carlson v. Reed, and that says that under Volandis, quote, as limited by Weinberger v. Salfi, a state violates due process where it creates a university tuition rate scheme that purports to be concerned with residency, but then applies an irrebuttable presumption precluding those seeking to meet its test of residency the opportunity to show factors clearly bearing on the issue. I'm still stuck with that provision of subsection H, where it appears to me that for professional students only, they are anchored in time back when they originally applied and entered the program, and their status is fixed in time, thereby preventing them the opportunity to establish themselves as bona fide residents, but also their record is locked in at that time, too. So if we have a rule that says that we look at your circumstances in time before you even started your first day, because under that rule, you have to have appealed before you've started into the program, if they're stuck there, how does that system allow the opportunity to prove they become a bona fide citizen, so that if someone enters the law school, moves to Montana six months before they start, enters the law school, maybe they had no intention of becoming a Montana resident when they move there, but based on a change of circumstances, they meet the love of their life, they get a great job in Montana, things change. And 100%, they want to, in a bona fide way, become a student. Under the four corners of subsection eight, prior to the 2023 revision, they could not change their status. Is that correct? No, that's not correct, because the exceptions still apply. So despite that prohibition, the sort of absolute language in that prohibition, as the district court recognized, the exceptions do temper that policy, because those are exceptions to even that professional degree requirement. So they can still apply for those exceptions while they're in school, and that will be considered... My last question, thank you, is, can you cite to me an example in the case law where the court looks beyond the four corners of the challenge provision to see how it was effectuated in practice? Even if the law or provision violates Flanders, we can look outside the record of the rule and see in practice how it was handled. Well, I think in the qualified immunity case context that we're looking at, the only defendant in this case that plaintiffs are focused on are Commissioner Christian. And so what he viewed and how he applied the policy is, what is at issue? And he was very clear that he applies this policy irrebuttably, he understood the requirements, and that's why he looked at the totality of the circumstances in each of these appeals, even though the plaintiffs here, like I said, didn't even come close. Bennett came the closest, as my friend suggests, but even he worked for his father out of state while in law school and moved away shortly after law school. So could I just, one or two other questions? Sure. Bellino, Bellino. Bellina, I think? Bellino, Bellino actually, you admitted in the answer that he had sought reclassification. Is that correct? Correct. Yeah. So there's no question about that. Correct. He never registered his vehicle. We know, do we know? There's nothing in the record that indicates what happened to his reclassification. Well, it was, I think there was a gap in the record on that question, but- Look for it, we couldn't find it. But he was denied reclassification and Bellina never registered his car or registered to vote in Montana. So he- We don't, but we don't have that in the record. Well, that is in the record. That's three S.E.R. 465 to 66 and S.E.R. 483 to 85. But we don't know what the commissioner did. Well, for Bellina, I think that may be right. Although you may be thinking of Hagan who didn't apply for reclassification. There's a little confusion on those two. Hagan actually didn't apply for reclassification and he was a student. Now, I think he didn't apply because he didn't make a great case to begin with because he didn't take many of the objective acts to establish the residency. Can I ask one more? So you're saying C, subsection C1, C3 is a catch-all exception to the bar? Is that how you read it? C3 under the old policy, C5 under the new and that's how the- So only in the event that none of the above indicators are appropriate, the person seeking in-state status may file an affidavit of intent to establish residency. Correct. So you're saying that that could happen at any time? Correct. Even after matriculation? Correct. And then under the new policy, H, the exceptions also apply the same way. It's not withstanding that policy. And that's why the district court said those exceptions temper the absolute language of the policy itself. And it also- Wait, let me ask you, what does that mean? It says only in the event that none of the above indicators are appropriate, the person seeking in-state status may file an affidavit of intent to establish residency. Right. And the plaintiffs, I think most if not all the plaintiffs did that in this case. And that's the title is an affidavit of intent to establish residency, but it's basically showing, and the new policy gives an example for somebody seeking refuge from domestic violence or remaining in Montana as a minor when a parent moves from Montana to establish residency elsewhere. There are a couple of examples. Obviously, those are not exclusive, but those- So that just means that the student intends, I'm going to do my best to become a- That that student has or is in the process of becoming a resident and there are circumstances outside- But what does that practically, what does that mean? It just puts the university on notice that I'm going to try and become a spent in-state student? Well, no, it puts the university on notice and then the commissioner will review that and university officials or university- Just review the notice of intent? Yes. And what it's asking is, have you become a resident? Are there circumstances that justify that you show that you want to make Montana your true fixed and permanent home? So I think we're getting a little hung up on the intent to establish residency, but I think it's talking about that I have established residency. I want to be a Montana resident and this is what I've done to establish that. And the law student at the record, 91 to 94, ER 91 to 94, or SCR 93 to 94, excuse me. I think that's a good example of how the commissioner views the policy and applies it. Which one was that? That's SCR 93 to 94. That's the law student who didn't meet the policy. His parents had moved him away for- Do you remember his name? I don't remember his name. In fact, I think it might be redacted. Caldwell Casey- It's not a plaintiff. It's the one that the commissioner said, yeah, this person has obviously done what he needed to do to show that he has indeed made Montana's true fixed and permanent home. And Atlantis itself said that universities can make virtually certain of that fact. When tempered by Weinberger, Salafi, I think that makes Montana's policy even further across the line as far as due process concerns. Sorry, just one last question. Just to make sure I got it right, that there's nothing in the policy that shows that the commissioner can grant residency notwithstanding the presumption. We're just relying on his testimony. His testimony and his reading of the policy that notwithstanding in the policy itself and the affidavit of intent and the fact that students are invited to present whatever information they want in trying to overcome their burden. Got it. Okay. Thank you. Any other questions? Okay. Thank you, counsel. Thank you, your honor. We'll give you three minutes. Thank you, your honor. Very quickly, actions speak louder than words. Commissioner, the amendments do not apply to G&H by the plain reading of that statute. Commissioner Christian said that he applies a totality of the circumstances, but the facts are he had never, up to the time of his deposition, he had never made an exception since 2012 ever. He made one after his deposition when he testified he's never made one before. That person had less going for them than Mr. Bennett, but he let him through. That is not the kind of action that proves his words are true. On summary judgment, clearly a reasonable finder of fact could conclude that the policy is applied as written, contrary to Carlson's or Christian's statement. Bolina did not have a vehicle, did not vote. That's why he didn't register. That's why he didn't vote. Some of these individuals, well, there's a general categorization that they didn't do what they needed to, but actually Nieman did everything. Bennett did everything. Bolina did everything that applied to him. Can you respond to that point that C3 in the old policy suggests that you could apply for residency notwithstanding everything else that's happened? You mean the affidavit of intent? Yeah, only in the event that none of the appropriate indicators are appropriate, the person seeking in-state status may file an affidavit of intent to establish residency. All these students did. They all filed affidavits of intent. All of the named plaintiffs. It didn't do any good. After the one year, after the period, after articulating? Yeah. See, the problem is you can't really do anything under the new policy and under, well, the old policy, you couldn't do anything. Under the new policy, you couldn't do anything unless you did more than 12 months. And then the whole point is that you could file this affidavit and say, notwithstanding that policy, I am a resident no matter what. And they all did. And what's important is- So you then can see that there is an ability to appeal the decision. And so it is irrebuttable, even if it's, it is rebuttable, even if it was never, that authority was never exercised. No, no, they all filed affidavits and the affidavits did them absolutely no good. None of them had any ties to any- Yeah, but there's a difference between the exercise of that discretion and the authority for that discretion. I mean, I think Vlandis cares more about the authority, not whether or not it was actually exercised. Sure. And what we have here is a record that shows that there was never an exception made until after the commissioner was deposed. The record here shows that the rule was irrebuttable on its face. The district court even found that it was unconstitutional as applied to these plaintiffs. Because there's a- While you could point to facts that might result in a different conclusion, clearly these facts show that these students were barred because they were professional students, something Vlandis doesn't allow. And, you know, Commissioner Christian said, and then I'll finish with this, he did it, applied the rule the way he did, to control the ratio for the limited number of seats in these programs. That's what he testified he did that's consistent with the written policy to keep these students corralled into non-resident and resident. Thank you, counsel. This case is submitted and we are adjourned for today. All rise. Hear ye, hear ye. All persons having business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart. For this court, the session now stands adjourned. Thank you.
judges: PAEZ, BUMATAY, Baggio